UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
ERIC SMITH,

                Petitioner,

                            <u>MEMORANDUM AND ORDER</u>
    -against-             14-CR-0264(JS), and
                            15-CR-0428(JS)[1]

UNITED STATES OF AMERICA,

                Respondent.
-------------------------------------X
APPEARANCES

For Petitioner:      Eric Smith, <u>Pro Se</u>
                    #89280-053
                    U.S.P. Atwater
                    U.S. Penitentiary
                    P.O. Box 019001
                    Atwater, California  95301

For Respondent:      Michael R. Maffei, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    610 Federal Plaza
                    Central Islip, New York  11722

SEYBERT, District Judge:

        On December 5, 2019, <u>pro se</u> petitioner Eric Smith ("Petitioner" or "Smith") moved to vacate, set aside, or correct his conviction and sentence pursuant to 28 U.S.C. § 2255

---

[1] Petitioner filed an identical Section 2255 Habeas Petition in Case Nos. 14-CR-0264 (<u>see</u> ECF No. 727) and 15-CR-0428 (<u>see</u> ECF No. 84). However, thereafter, all subsequent filings regarding the instant Section 2255 Habeas Petition occurred in Case No. 14-CR-0264. Therefore, hereafter, all citations to filings and entries in the Case Docket will be to those made in Case No. 14-CR-0264.

(hereafter, the "Petition").[2]  (See ECF No. 727 at ECF pp.2-11;[3] see also Suppl. Support Memo, ECF No. 745; Reply, ECF No. 756.)[4] The Government opposes the Petition.  (See Opp'n, ECF No. 748; see also Suppl. Opp'n, ECF No. 773.)  For the reasons that follow, Petitioner's Motion is **DENIED** in its entirety.

BACKGROUND

I.   The Challenged Conviction

Petitioner's challenged conviction arose out of his participation in the Roosevelt, New York "set" of the Rollin' 60s Crips, a nationwide street gang with members on Long Island, New York (hereafter, the "Gang").  (See Opp'n at 4 (citing Trial Tr. 320, 382-84, 1312, 1341-42, 1348, 1739, 1817-18, 2298, 2306-07).) The Government ultimately brought an eleven-count superseding indictment against Petitioner, charging him with: (1) racketeering in violation of 18 U.S.C. § 1962(c) (Count One); (2) racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count Two); (3) Hobbs Act robbery conspiracy of Rohan Hill (the "Hill Robbery") in violation of 18 U.S.C. § 1951(a) (Count Three); (4) Hobbs Act

---

[2] Although dated February 18, 2022 (see Petition at ECF p.10), Petitioner's Petition was notarized on February 17, 2022 (see id.), mailed on February 23, 2022 (see id. at ECF p.148), and filed with the Court on February 28, 2022 (see id. at ECF p.2).

[3]  Hereafter, the Court will cite to the internal page numbers of the Petition.

[4]  Petitioner also seeks the appointment of "stand by counsel". (See Motion for Appointment of Counsel, ECF No. 752; see also infra at 41-42 (ruling on said Motion).)

robbery of Hill in violation of 18 U.S.C. § 1951(a) (Count Four); (5) brandishing firearms during crimes of violence, Hobbs Act conspiracy and robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Five); (6) Hobbs Act robbery conspiracy of a drug dealer in the Trackside section of Hempstead (the "Trackside Robbery") in violation of 18 U.S.C. § 1951(a) (Count Six); (7) Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) (Count Seven); (8) brandishing a firearm during crimes of violence, Hobbs Act conspiracy and robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Eight); (9) murder of James McClenic in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1) (Count Nine); (10) firearm-related murder of McClenic in violation of 18 U.S.C. § 924(j) (Count Ten); and (11) conspiracy to murder and assault rival gang members in violation of 18 U.S.C. § 1959(a)(6) (Count Eleven). (See Trial Indictment, ECF No. 462 (combining the Indictments brought in Case Nos. 14-CR-0264 and 15-CR-0428).[5]) As to Count One, the racketeering count, the predicate acts included: (a) conspiracy to distribute controlled substances; (b) conspiracy to murder and assault rival gang members; (c) the attempted murder of rival gang member Isiah Cust; (4) three armed robberies in late 2010; (5) numerous substantive narcotics offenses; and (6) the

---

[5] The jury's Verdict Sheet reflected the counts and predicate acts outlined in the Trial Indictment. (Compare Verdict Sheet, Court Ex. 13, ECF No. 498 at ECF pp.1-7.)

December 15, 2010 murder of rival gang member James McClenic. (See id.)

In the ensuing five-week trial, which commenced May 16, 2017, the Government presented copious evidence against Petitioner, to wit: (1) the testimony of more than 30 witnesses, including (a) former Gang members Aaron Halyard, Reynaldo Hernandez, Gary Mosley, Essix Robinson, Rohan Hill, and Bryan Henry; (b) inmate Travis Walker, to whom Petitioner made several incriminatory admissions, including that he (Petitioner) shot and killed McClenic; and (c) civilians Nya Rampersad and Kenneth Jackson, who were present for the murder of McClenic; (d) various federal and local law enforcement officials; and (e) several expert witnesses; (2) copies of messages between Smith and McClenic whereby Smith threatened to kill McClenic; (3) social media postings and photographs; (4) audio recordings of gunfire; (5) surveillance footage from the vicinity of the McClenic murder scene showing Bryan Henry's car; and (6) transcripts and certificate of conviction from Petitioner's guilty pleas in which he pled guilty to six of the 12 racketeering acts charged in Counts One and Two of the Trial Indictment. (See Opp'n at 4-5; see also, e.g., New Trial Opp'n, ECF No. 529 at 1-2, 4 (asserting "the evidence of [Petitioner's] guilt was overwhelming, including, but not limited to, [Petitioner's] prior guilty pleas to several racketeering predicate acts, testimony of accomplices and victims

4

of [Petitioner's] robberies, and the testimony of [Petitioner's] accomplice and getaway driver, Bryan Henry, who drove [Petitioner] to and from the murder of James McClenic").)  On June 15, 2017, the jury returned its verdict finding Petitioner guilty on all counts.  (See June 15, 2017 Minute Entry, ECF No. 496; see also Verdict Sheet.)

Thereafter,[6] after considering the Probation Department's Presentence Investigation Report ("PSR") (see ECF No. 508 (sealed); see also PSR Addendum, ECF No. 530 (sealed)), and the objections thereto (see Petitioner's Objs., ECF No. 543; Gov't Objs., ECF No. 545), as well as affording Petitioner an opportunity to address the Court (see Sent'g Hr'g Tr., ECF No. 577), on June 13, 2018, the Court sentenced Petitioner to four consecutive life sentences to be followed by 30 years' (or 360 months') imprisonment; no supervised release was imposed.  (See Sent'g Hr'g Tr.; see also Judgment, ECF No. 553.)  Said sentence was made after the Court's consideration of the applicable Section 3553(a) Factors, including Petitioner's: being "a confirmed criminal"; "horrific, violent conduct"; utter lack of remorse or rehabilitation; and the need to protect the public.  (See id. at

---

[6] For completeness, the Court notes, after the conclusion of his trial, Petitioner moved for a new trial.  (See New Trial Motion, ECF No. 523; New Trial Opp'n, ECF No. 529; New Trial Reply, ECF No. 531; New Trial Suppl. Reply, ECF No. 539.)  At an April 19, 2018 motion hearing, ruling from the bench, the Court denied Petitioner's New Trial Motion.  (See Minute Entry, ECF No. 540.)

16-17.)  Petitioner did not appeal his conviction or sentence. (See Petition at 2; see also Case Docket, in toto.)

## II. The Underlying Crimes Giving Rise to Petitioner's Prosecution[7]

### A. The Gang, Generally

Petitioner, who was known as "Esama", held a leadership role in, and was an enforcer for, the Gang. (See Opp'n at 4 (citing Trial Tr. 320-24, 382-84, 1036, 1308-09, 1341-43, 1348, 1629-31, 1736, 1739, 1742, 1817-19, 2298-99, 2306-08).) The Gang engaged in a variety of criminal activities, including narcotics trafficking, robbery, and murder. (See id. at 5 (citing Trial Tr. 326, 330-31, 333-34, 491-92, 928-33, 1316, 1323-25, 1342-43,

---

[7]  The Court presumes familiarity with the facts underlying this case, but provides the following summary for the reader's convenience, with the facts being drawn from the Superseding Indictment, referred to herein as the "Trial Indictment" (see ECF No. 462), and Petitioner's criminal trial before this Court held from May 10, 2017 through June 15, 2017.  (See Case Docket); see also generally Osborne v. United States, No. 14-CR-0264, 2022 WL 1693668, at *1-3 (E.D.N.Y. May 26, 2022) (providing general background information on Rollin' 60s Crips set; decision denying co-defendant Osborne's Section 2255 habeas petition); Hernandez v. United States, No. 14-CR-0264, 2021 WL 3426110, at *1-2 (E.D.N.Y. Aug. 5, 2021) (providing general background information on Rollin' 60s Crips set; decision denying co-defendant Hernandez's Section 2255 habeas petition).

As evidenced by the verdict sheet, the jury found Petitioner guilty of many racketeering acts, which included acts of violence, e.g., armed robberies, attempted murder, and murder, as well as various narcotics distribution-related acts.  (See, e.g., Opp'n at 7-19 (providing accurate, extensive recitation of various RICO predicate acts for which Petitioner was charged and found guilty).) However, the Court has limited its description of such acts to those crimes which are relevant to the issues raised by Petitioner in his Petition.

1350-53, 1408-11, 1423-25, 1429-31, 1655, 1686-89, 1744-46, 1813, 1834-35, 2301); Trial Indictment ¶1; Verdict Sheet, ECF No. 498 at ECF pp.1-7, as to Count One (RICO)); see also, e.g., Osborne, 2022 WL 1693668, at *1.   By participating in these crimes, members achieved higher standing in the Gang, i.e., the more crimes committed by the member, the higher the member's rank.  (See id. at 6 (citing Trial Tr. 326, 1316, 1323-25, 1342-43, 1647-48, 1744-46, 1834- 35, 2301)); see also, e.g., Osborne, 2022 WL 1693668, at *1.  Among other things, Gang members were required to attack and kill rival gang members on sight (the "on sight rule").  (See id. at 6, 7 (citing Trial Tr. 529-31, 1042, 1320-23, 1656, 1742-44).); see also, e.g., Osborne, 2022 WL 1693668, at *1.

B.   Relevant Criminal Activities by Petitioner

In Fall 2010, Petitioner and Aaron Halyard ("Hayland"), along with other Gang members, committed robberies of two drug dealers.  The first robbery was of a marijuana dealer known as "Fish" (hereafter, the "Fish Robbery").  (Trial Tr. 455:2-456:23.) The day of the Fish Robbery, Petitioner, Halyard, and another Gang member drove to meet Fish; Halyard entered Fish's vehicle, took the marijuana, then displayed a firearm.  (Trial Tr. 459:13-460:4.) Petitioner then pulled Fish out of his car and struck him with the butt of a gun.  (Trial Tr. 460:5-19.)

A second robbery occurred in the "Trackside" neighborhood of Hempstead, New York (hereafter, the "Trackside

Robbery"). On the day of that Robbery, Petitioner and Halyard, along with two other Gang members, drove to the "Trackside" neighborhood with firearms. (Trial Tr. 449:12-22.) Armed with guns, Halyard and another Gang member robbed a drug dealer of five grams of cocaine, between fifteen and twenty grams of crack cocaine, and $1,500 in cash. (Trial Tr. 450:18-453:10.)

  C. <u>The Murder of McClenic</u>

   In Fall 2010, after learning rival gang member McClenic had been committing assaults against Gang members and disrespecting the Crips on social media, the Gang's leader, Raphael Osborne, ordered McClenic be "dealt with", <u>i.e.</u>, killed. (<u>See</u> Trial Tr. 673-76, 1487-90, 1764-66). To that end, on December 15, 2010, Henry picked up Petitioner at another Gang member's home and, together with a yet a third Gang member, the three drove to the Hempstead/Uniondale area looking for a green Mercedes Benz truck (hereafter, the "Truck") in which Petitioner believed McClenic to be; Petitioner had a gun with him. (Trial Tr. 2421-28; <u>see also</u> <u>id.</u> at 680, 683-85, 941-43.) When the Truck was located, Petitioner: exited Henry's car; walked up to the Truck; knocked on the Truck's side-door window where McClenic sat; and, then, shot and killed McClenic. (Trial Tr. 2426-37, 2247-49; <u>see also</u> <u>id.</u> at 690, 741-42; 2620-21.) Thereafter, Petitioner: "dropped the clip", <u>i.e.</u>, the magazine from the firearm Petitioner used to kill McClenic; ran back to Henry's car, re-entering it; and, ordered

Henry to drive away from the scene.  (Trial Tr. 2435-40; see also id. 688-89.)

III. Petitioner's Petition and the Government's Opposition Thereto

Petitioner raises four grounds challenging his conviction.  (See generally Petition.)  First, he asserts his VICAR[8] charges cannot serve as predicate offenses for his Section 924(c) convictions since VICAR crimes can be committed recklessly, meaning they are not crimes of violence (Ground One).  (See id. at 4.)  Second, Petitioner argues his RICO conspiracy conviction cannot support his Section 924(j) conviction (Ground Two).  (See id. at 5.)  Third, Petitioner claims his Hobbs Act Robbery conspiracy convictions must be vacated since such conspiracies are no longer considered crimes of violence and, therefore cannot act as predicate offenses for his Section 924(c) convictions (Ground Three).  (See id. at 6.)  Fourth, he asserts "newly discovered evidence", i.e., the "affidavit" of his co-defendant, Bryan Henry ("Henry"), in which "affidavit" Henry contends he was coerced to testify against Petitioner regarding the McClenic murder despite "not knowing anything about the murder", thereby calling into question Petitioner's conviction (Ground Four).  (Id. at 7.)

Unsurprisingly, the Government opposes the Petition.  (See generally Opp'n.)  As to Ground One:  The Government asserts

---

[8]    "'VICAR' is an acronym for 'Violent Crimes in Aid of Racketeering.'"  Osborne, 2022 WL 1693668, at *2 n.2.

Petition "is wrong as a matter of law." (Id. at 3; see also id. at 26.)   As to Ground Two:   The Government contends since Petitioner's Section 924(j) conviction, i.e., Count Ten, was specifically predicated upon Count Nine, which was a count of murder and is a crime of violence, Petitioner is factually wrong in his position.   (See id. at 2-3; see also id. at 26.)   As to Ground   Three:   Acknowledging,   post-Davis,   Section   924(c) convictions cannot be predicated upon robbery conspiracies, the Government argues Petitioner's Section 924(c) convictions were also   predicated   upon   "still-valid   substantive   robberies"; therefore, the error of which Petitioner complains is harmless. (Id. at 3 (citing United States v. Davis, 588 U.S. 445 (2019); see also id. at 26-27.)   As to Ground Four:   The Government maintains, "[a]ll of the credible evidence demonstrates that Henry testified truthfully at trial and his purported recantation, which was motivated by Henry's financial interest, is patently false." (Id.; see also id. at 37.)   Moreover, according to the Government, since evidence of Petitioner's guilty "was overwhelming, the jury's verdict would have been the same" even without Henry's testimony. (Id.)   The Government requests the Petition be denied without a hearing.   (See id. at 3, 37, 47.)

[Remainder of page intentionally left blank.]

10

IV.   <u>Co-Defendant Henry's Various Court Filings</u>

    A.   <u>Verified Complaints in Henry's Section 1983 Action</u>

        After it became of aware of it and in accordance with its ongoing <u>Brady</u> disclosure obligations, on January 18, 2022, the Government forwarded to Petitioner the October 2021 verified civil complaint of co-defendant Henry (hereafter, the "Verified Complaint"), pursuant to which Henry sought compensatory and punitive damages for alleged civil rights violations by members of the Nassau County Police Department ("NCPD") (hereafter, the "Section 1983 Action"[9]).   (<u>See</u> Petition at ECF pp.105-47 (Verified Complaint (with exhibits)[10])); <u>see also</u> Opp'n at 24 (citing Gov't Cover Ltr. to Smith, ECF No. 721).)   Of relevance here, in the Verified Complaint, co-defendant Henry asserted, <u>inter alia</u>, his Section 1983 Action arose "from a robbery that occurred on December 13, 2010, and a homicide that occurred on December 15, 2010", <u>i.e.</u>, the McClenic murder, which were "unrelated to each other" and of which "he was and is innocent of the crimes of which he was arrested, tried and convicted."   (Verified Complaint ¶¶ 11, 24.) In context, it is readily apparent Henry's Section 1983 Action related to Henry's state arrest and conviction, which conviction

---

[9]   <u>See</u> <u>Henry v. Brzeski, et al.</u>, No. 21-CV-5682 (JMA) (E.D.N.Y. Oct. 12, 2021).

[10]   Presumably, because it is a Verified Complaint, throughout, the Government refers to said Verified Complaint as Henry's "affidavit" or declaration.   (<u>See, e.g.</u>, Opp'n at 24.)

was ultimately reversed and vacated.  (See generally id., in toto.)
Significantly, pursuant to a vacatur agreement (hereafter, the
"Vacatur Agreement"), Henry secured the vacatur of his state
conviction because of his cooperation in the prosecution of
Petitioner in this case, as well as his (Henry's) guilty plea in
the instant case to one count of murder in aid of racketeering for
his role in the McClenic murder.  (See Oct. 25, 2018 Vacatur
Agreement, Ex. 2, ECF No. 748-2, attached to Opp'n.)  As part of
the terms of his Vacatur Agreement, Henry agreed to waive several
rights, including his right to "any kind of civil lawsuit against"
any employees of the NCPD.  (See id. at 1.)

Based primarily upon the waiver terms of the Vacatur
Agreement, which Agreement was relied upon in asserting an
affirmative defense (see Section 1983 Action, Answer, ECF No. 12,
¶176 (raising a mutual release affirmative defense; relying upon,
inter alia, waiver terms of Vacatur Agreement)), in early 2023,
Honorable Joan M. Azrack granted the NCPD officer-defendants'
motion for judgment as a matter of law in Henry's Section 1983
Action.  See Henry v. Brzeski, No. 21-CV-5682, 2023 WL 2021018, *1
(E.D.N.Y. Feb. 15, 2023) (over objections of Henry, adopting
magistrate's report and recommendation that "Vacatur [Agreement]
bars the claims in the Complaint, which are all brought against
employees of the [NCPD] primarily as a result of [Henry's] December
22, 2010 arrest resulting in" a state criminal action (citation

modified)).)  Judge Azrack also denied Henry's request to amend
his Verified Complaint, which he moved to do at the end of December
2022, while the NCPD-defendants' motion for judgment as a matter
of law was pending.  See id. at *2.  Explaining her amendment
denial, Judge Azrack stated:

> Plaintiff seeks to remove paragraphs 89-100 of
> his [Verified C]omplaint, which address his
> federal guilty plea, "as such section is
> irrelevant, unnecessary, and holds no bearing
> to the claims alleged against any of the
> [NCPD-]Defendants."    However,  [Henry's]
> proposed amendment would not remedy the flaw
> at the heart of his complaint: namely, that
> the . . . Vacatur [Agreement] bars this § 1983
> action.  Accordingly, leave to amend is denied
> as futile.

Id. (quoting Henry's Motion to Amend).

Like  his  October  2021  Verified  Complaint,  Henry's
December 2022 proposed Amended Complaint was also verified.  (See
Section 1983 Action, Proposed Amended Verified Complaint, Ex. A.,
attached to Henry Support Decl., ECF No. 36 at ECF pp.5-6.)
According  to  his  accompanying  support  memo,  submitted  under
penalty of perjury (see Section 1983 Action, Amendment Support
Memo, ECF No. 36 at ECF pp.60-65), Henry "propose[d] to Amend his
Verified Complaint to remove Section E, Paragraphs 89-100 of the
Verified Complaint, as such section is irrelevant, unnecessary,
and holds no bearing to the claims alleged against any of the

[NCPD-]Defendants." (Id. at 3;[11] see also id. at 4 (stating "[t]he proposed amendment seeks to remove irrelevant and unnecessary claims lodged against non-party actors, that ha[ve] no connection to [NCPD-]Defendants and their liability to [Henry's] Civil [§] 1983 claims", and that Henry's Section 1983 Action "is not about what occurred during some irrelevant federal indictment that began almost four years after [NCPD-]Defendants committed their unlawful acts").) And, in addition to removing paragraphs 89 through 100, Henry also removed his original paragraph 24, in which he proclaimed his innocence. (Compare Proposed Amended Verified Complaint, with Verified Complaint.)

   B.   Henry's Motion for Early Termination of Supervised Release in this Action

       In June of 2022, as motion practice was being pursued in Henry's Section 1983 Action, in the instant criminal action, Henry moved for early termination of his five years of supervised release. (See Early Termination Motion, ECF No. 737.) Among other statements he made, Henry stated:

> 4.   .  .  .  Mr. Henry was arrested under a superseding federal indictment that charged him with one count of Murder in Aid of Racketeering Activity pursuant to 18 U.S.C. [§] 1959(a)(1). See Dkt. No. 429.
>
> 5.   After Agreeing to cooperate with the government, on March 16, 2017, Mr. Henry pleaded guilty to the single count of 18 U.S.C. [§] 1959(a)(1). See Dkt. No. 431.

---

[11]   Citation to internal page number(s).

* * *

44. . . .

    o  Undoubtedly, the crime Mr. Henry was convicted of was certainly serious, as Mr. Henry was one of fifteen co-defendants in a superseding gang-racketeering conspiracy indictment that included drugs and other violent offenses.

    o  The crime Mr. Henry was accused and convicted of playing was the driver for a co-defendant who shot and killed a rival gang member. Mr. Henry decided to cooperate with the Government, and his cooperation lead to the conviction of the shooter. After pleading guilty, Mr. Henry was sentence to time served and five years of supervised [release].

* * *

47. . . .

    o  Your Honor presided over all proceedings of this case. Your Honor was fully versed of every fact, accusation, complaint, submission, motion, hearing, proceeding[,] and trial that took place. Your Honor was able to glean over Mr. Henry's appearance, demeanor, and representations.

(Id. at ¶¶ 4, 5, 44, 47; see also id. at note 2 (stating Superseding Indictment was "for the same murder charge that Mr. Henry was tried and convicted of before the New York Supreme Court").)  Of relevance, Henry's pro se Early Termination Motion was signed under penalty of perjury.  (See id. at 14.)  As accurately stated by the Government:  "Henry's [Early Termination M]otion is devoid of any

15

claims of innocence, coercion or that his testimony at [Petitioner's] trial was false." (Opp'n at 25.)

In September 2022, the Court held a motion hearing on Henry's Early Termination Motion, for which Henry was present. (See Sept. 21, 2022 Minute Entry, ECF No. 759.) Ruling from the bench, the Court granted in part and denied in part Henry's Early Termination Motion, with conditions of his supervised release being modified. (See id.) Thereafter, Henry attended two related hearings. (See Jan. 26, 2023 Minute Entry, ECF No. 769; Apr. 4, 2023 Minute Entry, ECF No. 777.) During these hearings, the Court found Henry to be knowledgeable, persistent and forthright.

## DISCUSSION

## I.    The § 2255 Standard

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." Harrington v. Richter, 562 U.S. 86, 91, 131 S. Ct. 770, 780, 178 L. Ed. 2d 624 (2011). To obtain relief under Section 2255, a petitioner must show "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a); see also United States v. Hoskins, 905 F.3d 97, 102 (2d Cir. 2018). Therefore, a collateral attack on a conviction or sentence is

16

available "for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)); accord Cuoco v. United States, 208 F.3d 27, 30 (2d Cir. 2000); Rodriguez v. United States, No. 11-CV-2957, 2013 WL 6171618, at *3 (S.D.N.Y. Nov. 25, 2013), aff'd, 679 F. App'x 41 (2d Cir. Feb. 15, 2017).  A petitioner must also show that the error had "substantial and injurious effect" that caused "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation marks and citations omitted); Underwood v. United States, 166 F.3d 84, 87 (2d Cir. 1999) (applying Brecht to a § 2255 motion).

When determining whether to grant relief, Second Circuit precedent "instructs that § 2255 review is 'narrowly limited in order to preserve the finality of criminal sentences and to effect the efficient allocation of judicial resources.'" Hoskins, 905 F.3d at 102 (quoting Graziano v. United States, 83 F.3d 587, 590 (2d Cir. 1996) (internal quotation marks omitted)).  Indeed, to "obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152-53, 166 (1982).  Further, a court must exercise its discretion sparingly because § 2255 applications "are in tension with society's strong interest in the finality of

criminal convictions." _Elize v. United States_, No. 02-CV-1530, 2008 WL 4425286, at *5 (E.D.N.Y. Sept. 30, 2008) (internal quotation marks and citation omitted); _see also_ _Brecht_, 507 U.S. at 633–34.  Additionally, in advancing a federal habeas corpus writ, the petitioner has the burden of proving his claims by a preponderance of the evidence.  _See_ _Negron v. United States_, 520 F. Supp. 3d 296, 301 (E.D.N.Y. 2021) ("A § 2255 movant bears the burden to prove the claims in his § 2255 motion by a preponderance of the evidence." (citing _Triana v. United States_, 205 F.3d 36, 40 (2d Cir. 2000) (further citation omitted)); _accord_ _Skaftouros v. United States_, 667 F.3d 144, 158 (2d Cir. 2011).

As Petitioner's submissions were filed _pro se_, the Court has liberally construed them "'to raise the strongest arguments that they suggest.'" _Kirkland v. Cablevision Sys._, 760 F.3d 223, 224 (2d Cir. 2014) (quoting _Burgos v. Hopkins_, 14 F.3d 787, 790 (2d Cir. 1994)).  Nonetheless, this does not excuse Petitioner "'from comply[ing] with relevant rules of procedural and substantive law.'" _Traguth v. Zuck_, 710 F.2d 90, 95 (2d Cir. 1983) (quoting _Birl v. Estelle_, 660 F.2d 592, 593 (5th Cir. 1981)).

## II.  Analysis of Petitioner's Habeas Claims

The Court addresses Petitioner's grounds for habeas relief out of order.  It will: first address Ground Two; then address Grounds One and Three together; and, conclude by addressing Ground Four.

A.    <u>Ground Two:  The Section 924(j) Conviction</u>

To the extent Petitioner implies his Section 924(j) conviction, <u>i.e.</u>, his conviction under Count Ten, was predicated upon his RICO conspiracy count, <u>i.e.</u>, Count Two (<u>see</u> Petition at 5), he is mistaken.  It is abundantly apparent from the Trial Indictment that the only count therein to reference Section 924(j) is Count Ten.  (<u>See</u> Trial Indictment, <u>in toto</u>; <u>see also</u> <u>id.</u> at Count Ten, ¶37.)  As explained <u>infra</u>, Count Ten, the count charging firearms-related murder, is predicated upon a valid, crime-of-violence offense, <u>to wit</u>, Count Nine, a murder charge. Thus, Petitioner's flawed contention put forth in Ground Two is unavailing and does not warrant habeas relief.

Recently, in <u>United States v. Farmer</u>, in denying a Section 2255 habeas petition where the petitioner sought to vacate his similar Section 924(c) conviction based upon <u>Davis</u>, this Court first instructed:

> Section 924(c) allows for an enhanced sentence where the defendant used a firearm in the commission of a "crime of violence." 18 U.S.C. § 924(c). The statute has two definitions of "crime of violence." The elements clause defines a "crime of violence" as a felony that "has an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). The residual clause defines a "crime of violence" as a felony "that by its nature,

> involves a substantial risk that
> physical force against the person or
> property of another may be used in
> the course of committing the
> offense." 18 U.S.C. § 924(c)(3)(B).

> United States v. Minaya, No. 01-CR-0619,
> 16-CV-3513, 2025 WL 1126106, at *1 (S.D.N.Y.
> Apr. 16, 2025). "Davis held that the residual
> clause in Section 924(c)(3)(B) is
> unconstitutionally vague." Id. (citing Davis,
> 588 U.S. at 470.) "Thus, a petitioner may
> challenge his Section 924 conviction if he was
> convicted of a crime of violence as defined in
> the residual clause." Id. at *4.

United States v. Farmer, No. 04-CR-0209, 2025 WL 2932773, at *3 (E.D.N.Y. Oct. 15, 2025). Then, upon analyzing the specific facts of the case, the Court found Farmer's Section 924(c) conviction remained valid after Davis. See id. at *3-4. Rejecting Farmer's "indivisible" stance, the Court applied the required "modified categorical approach" to determine whether Farmer's conviction for murder in aid of racketeering, the predicate crime supporting Farmer's Section 924(c) conviction and a substantive VICAR offense, constituted a crime of violence for purposes of Section 924(c). See id. at *3 (citing United States v. K. Davis, 74 F.4th 50, 54 (2d Cir. 2023) (rejecting defendant's "contention that the VICAR murder statute is indivisible", and holding "the modified categorical approach applies to our consideration of whether [defendant's] conviction for murder in aid of racketeering, a substantive VICAR offense, constitutes a crime of violence for purposes of § 924(c)"). The statute cited in the predicate VICAR

20

murder count was New York State's second-degree murder statute, N.Y.P.L § 125.25.   See id. at *4.   Ultimately, this Court found, "here 'only subsection (1) of N.Y.P.L. § 125.25—which punishes a defendant who has the 'intent to cause the death of another person' and causes the death of such person or of a third person'—can give rise to an [intentional] murder count and applies to [Petitioner's] conduct.'"   Id. (quoting United States v. Jordan, Nos. 19-CR-3032(L), 19-CR-3365(Con.), 19-CR-4070(Con.), 2024 WL 445000, at *4 (2d Cir. Feb. 6, 2024) (summary order)).   Thus, this Court rejected both Farmer's "suggestion that certain of the scenarios outlined in N.Y.P.L. § 125.25 can be accomplished nonviolently" and his argument that the VICAR murder count "did not allege a categorical 'crime of violence'".   Id.   And, of further relevance here, the Court stated its determination was:

> further supported by the Circuit Court's decision in K. Davis and its summary order in Moore v. United States. See K. Davis, 74 F.4th at 55-56 (finding N.Y.P.L § 125.25(1) is a "crime of violence"; stating "[t]here is no question that intentionally causing the death of another person involves the use of force" (quoting [United States v.] Pastore, 36 F.4th [423,] 429 [(2d Cir. 2022)]; further citation omitted)); Moore v. United Sates, No. 16-3715-PR, 2021 WL 5264270 (2d Cir. Nov. 12, 2021) (summary order) (affirming denial of Davis-based habeas petition; rejecting petitioner's argument that his Section 924(c) conviction, predicated upon a VICAR murder committed in violation of N.Y.P.L § 125.25(1), could not be considered a "crime of violence"; holding "the district court correctly concluded that VICAR intentional murder

> constitutes a 'crime of violence' for purposes
> of 18 U.S.C. § 924(c)(3)(A)"). Indeed, before
> its precedential decision in K. Davis, the
> Second Circuit noted in Moore: "[O]ur case
> law makes clear that intentional murder as
> defined in NYPL § 125.25(1) is itself a crime
> of violence."  2021 WL 5264270, at *2 n.1
> (citing United States v. Scott, 990 F.3d 94,
> 100 (2d Cir. 2021)).

Id. at *5.

The Court's rationale in Farmer applies here.  The predicate offense supporting Petitioner's Section 924(j) conviction under Count Ten, the firearms-related charge, was the VICAR intentional murder of McClenic, which offense was a separate count of the Trial Indictment, to wit, Count Nine.  Count Nine charged, inter alia:

> On or about December 15, 2010, within the
> Eastern District of New York, the defendant
> ERIC SMITH, also known as "Esama" and "Esco,"
> together with others, for the purpose of
> maintaining and increasing position within the
> Crips, an enterprise engaged in racketeering
> activity, did knowingly and intentionally
> murder James McClenic, in violation of New
> York State Penal Law Sections 125.25(1) and
> 20.00.

(Trial Indictment, Count Nine, ¶36 (emphasis added).)  In turn, Count Ten, i.e., which is the only count in the Trial Indictment that relies upon Section 924(j), specifically charged:

> On or about December 15, 2010, within the
> Eastern District of New York, the defendant
> ERIC SMITH, also known as "Esama" and "Esco,"
> together with others, in the course of a
> violation of Title 18, United States Code,
> Section 924(c), to wit: the knowing and

22

> intentional use of one or more firearms <u>in connection with a crime of violence</u>, to wit: <u>the crime charged in Count Nine</u>, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing was murder as defined in Title 18, United States Code, Section 1111, in that the defendant, together with others, with malice aforethought, did unlawfully kill James McClenic.

(<u>Id.</u>, Count Ten, ¶37 (emphasis added).)  There can be no doubt in this instance that the predicate offense to Count Ten is Count Nine, as clearly defined in Count Ten.  Nor can there be any debate in this instance that Count Nine--charging Petitioner with the intentional murder of McClenic in violation of N.Y.P.L. § 125.25(1)--was a crime of violence.

Under the applicable "modified categorical approach", <u>see</u> <u>United States v. Pastore</u>, 83 F.4th 113, 118 (2d Cir. 2023), here, based upon the Trial Indictment, the specific predicate crime supporting Petitioner's Section 924(j) conviction is N.Y.P.L. § 125.25(1), as identified in Count Nine.  The Second Circuit has explicitly held N.Y.P.L. § 125.25(1) is a "crime of violence", stating "[t]here is no question that intentionally causing the death of another person involves the use of force".  <u>K. Davis</u>, 74 F.4th at 55-56 (quoting <u>Pastore</u>, 36 F.4th at 429; further citation omitted)); <u>see also</u> <u>Farmer</u>, 2025 WL 2932773, at *5.  Hence, because Petitioner's "conviction for VICAR murder, predicated on second-degree intentional murder under N.Y. Penal Law § 125.25(1), [<u>i.e.</u>,

his conviction on Count Nine,] categorically qualifies as a crime of violence under § 924(c)", K. Davis, 74 F.4th at 56, and which conviction was the predicate offense for Count Ten, Petitioner's conviction on Count Ten remains constitutional.  Therefore, the Court rejects Petitioner's Ground Two as a basis for granting habeas relief.

     B.   Grounds One & Three:  The Section 924(c) Convictions

     Petitioner's claims for habeas relief raised in Grounds One and Three fare no better.  As an initial matter, regarding Ground One, Petitioner's argument is misplaced; he advances his position relying upon Arizona and Utah state criminal laws (see Petition at 4), which are inapplicable to his case.  He also broadly asserts that crimes which can be committed recklessly can no longer serve as predicate crimes of violence supporting Section 924(c) convictions.  (See id.)  While generally true, that is not the case regarding Petitioner's two Section 924(c) convictions, as discussed in more detail below.  Therefore, Ground One fails to provide the Court with a basis to grant habeas relief.

     As to Ground Three:  In essence, Petitioner challenges his Section 924(c) firearm convictions brought pursuant to Counts Five and Eight.  (See Petition at 6.)  Count Five and Count Eight was each predicated upon one count of Hobbs Act Robbery Conspiracy and one count of Hobbs Act Robbery.  (See Trial Indictment, Count Five, ¶30 (defining the predicate offenses as Counts Three (the

24

conspiracy robbery count), and Count Four, (the substantive robbery count), and Count Eight ¶33 (defining the predicate offenses as Count Six (the conspiracy robbery count), and Count Seven (the substantive robbery count)).) However, as the Government astutely argues, "Because the two Section 924(c)convictions were predicated on substantive robbery counts, which remain valid crimes of violence after <u>Davis</u>, [Petitioner's habeas] motion fails." (Opp'n at 32.) The Court agrees.

This Court denied the habeas petition of Petitioner's co-defendant, Raphael Osborne, based upon Osborne's strikingly similar, <u>Davis</u>-based Section 924(c) argument. See <u>Osborne</u>, 2022 WL 1693668, at *5-6. The Court explained:

> [Osborne] contends that Hobbs Act robbery conspiracy cannot serve as the predicate offense for his Section 924(c) convictions for Count Five[12] and Count Eight.[13] While that is true, it is not conclusive here because [Osborne's] convictions with respect to the Fish Robbery and the Trackside Robbery remain "crimes of violence"; hence, those robbery

---

12 "<u>Count Five [charged]</u> brandishing firearms during a crime of violence, Hobbs Act conspiracy and robbery, in violation of 18 U.S.C. § 924(c)(1)(C)(i)." <u>Osborne</u>, 2022 WL 1693668, at *2. Counts Three, Four, and Five related to the so-called "Fish Robbery". (See Case No. 14-CR-0264 Case Docket, <u>Osborne</u> Superseding Indictment, ECF No. 226, Racketeering Act Two.)

13 "<u>Count Eight [charged]</u> brandishing a firearm during a crime of violence, Hobbs Act conspiracy and robbery, in violation of 18 U.S.C. § 924(c)(1)(C)(i)." <u>Osborne</u>, 2022 WL 1693668, at *2. Counts Six, Seven, and Eight related to the so-called "Trackside Robbery". (See Case No. 14-CR-0264 Case Docket, <u>Osborne</u> Superseding Indictment, ECF No. 226, Racketeering Act Three.)

convictions remain valid predicates for his convictions on Counts Five and Eight.

Following his trial, the jury convicted [Osborne] not only of Hobbs Acts robbery conspiracy for his participation in the Fish and Trackside Robberies, i.e., Counts Three and Six, respectively, but also convicted him of substantive Hobbs Act robbery for both those Robberies, i.e., Counts Four and Seven, respectively. The Second Circuit has held "that Hobbs Act robbery 'has as an element the use, attempted use, or threatened use of physical force against the person or property of another.'" [United States v.] Hill, 890 F.3d [51,] 60 [(2d Cir. 2018)] (quoting 18 U.S.C. § 924(c)(3)(A)). Although Hill predates Davis, the Second Circuit has consistently reaffirmed Hill post-Davis. See United State v. Walker, 789 F. App'x 241, 245 (2d Cir. 2019) (holding that "[o]ur prior holding in United States v. Hill, that substantive Hobbs Act robbery is a crime of violence under the elements clause of § 924(c)(3)(A), is unaffected by Davis, Stokeling, and Barrett and remains binding on us in this case" (internal citations omitted)); see also United States v. Biba, 788 F. App'x 70, 72 (2d Cir. 2019). Moreover, where, as here, "a jury is instructed on both valid and invalid predicate offenses, the conviction stands if the verdict undoubtedly rests on a valid . . . predicate." United States v. Sessa, No. 20-CV-1957, 2020 WL 3451657, at *5 (E.D.N.Y. Jun. 24, 2020) (internal quotation marks omitted); see also United States v. Vasquez, 672 F. App'x 56, 61 (2d Cir. 2016) (holding that where a defendant's Section 924(c) conviction was predicated on a crime that is not a categorial crime of violence, the error was harmless because "there was no possibility that the jury's § 924(c) verdict rested only on [a potentially unlawful] predicate"); United States v. Walker, 789 F. App'x 241, 244-45 (2d Cir. 2019), cert. denied, 140 S. Ct. 979 (2020).

26

> Because [Osborne] was convicted of substantive Hobbs Act robbery for both the Fish and Trackside Robberies, [his] corresponding Section 924(c) convictions on Counts Five and Eight are not affected by Davis. Accordingly, [Osborne's] claim for habeas relief on that basis fails.

Id. at *6-7; see also Sessa v. United States, 2020 WL 3451657, at *5 ("[I]f a jury is instructed on both valid and invalid predicate offenses, the conviction stands if the verdict 'undoubtedly rests on a valid . . . predicate[.]'" (quoting United States v. Vasquez, 672 F. App'x 56, 61 (2d Cir. 2016)) (further citation omitted).

Moreover, the Court further elucidated:

> [A]nother offense may serve as a predicate if there is "legally sufficient proof that the crime was, in fact, committed." Johnson v. United States, 779 F.3d 125, 129 (2d Cir. 2015) ("Every circuit court to have considered the issue has concluded that § 924(c) does not require the defendant to be convicted of (or even charged with) the predicate crime, so long as there is legally sufficient proof that the predicate crime was, in fact, committed." (collecting cases)); United States v. Rivera, 679 F. App'x 51, 55 (2d Cir. 2017) (summary order) (denying a petitioner's Johnson claim where the defendant's plea allocution provided sufficient proof for a predicate offense that was later dismissed at sentencing).

Id. at *7 (emphasis added). Thus, notwithstanding any invalidation of the robbery conspiracy counts as predicate offenses, this Court found Osborne's convictions on the substantive robberies counts, i.e., the Hobbs Act Robberies counts, provided legally sufficient proof that the armed robberies were committed and, therefore,

remained valid predicate acts supporting Osborne's Section 924(c) convictions.

The same rationale applies here.  Because Petitioner's Section 924(c) firearm convictions, Counts Five and Eight, were each predicated upon valid Hobbs Act Robbery convictions, i.e., Counts Four and Seven, respectively, which remain "crimes of violence", see United States v. McCoy, 54 F.4th 72, 74 (2d Cir. 2023) (stating it is the Second Circuit's "settled understanding that completed Hobbs Act robberies are categorically crimes of violence pursuant to section 924(c)(3)(A)"); see also United States v. Barrett, 102 F.4th 60, 82 (2d Cir. 2024) (stating ten other circuit courts also hold substantive Hobbs Act robbery to be a Section 924(c)(3)(A) crime of violence; collecting cases), his assertion that conspiracy Hobbs Act Robbery convictions are no longer considered crimes of violence, while true, is not enough to warrant habeas relief.  Petitioner's convictions on Counts Four and Seven, the Hobbs Act Robbery counts, provide sufficient proof he committed those crimes of violence; therefore, they continue to serve as valid predicate offenses to his Section 924(c) convictions.  Therefore, the Court denies the Petition based upon Ground Three as it is unavailing.

[Remainder of page intentionally left blank.]

C.   Ground Four:  The Newly Discovered Evidence Claim

1.   The Parties' Arguments

Petitioner asserts that newly discovered evidence, in the form of Henry's Section 1983 Action Verified Complaint, supports his claim for habeas relief because Henry, in essence, committed perjury, thereby depriving Petitioner of a fair trial. (Petition at 7; see also Suppl. Support Memo at 4.)  Petitioner argues Henry acquiesced to pressures from the federal prosecution team to testify against Petitioner about the McClenic murder.  (See id.; see also Suppl. Support Mem at 1.)  According to Petitioner, the Government was able to pressure Henry into giving purportedly false testimony because Henry was also facing a potential life sentence for his involvement in the McClenic murder, which, if Henry cooperated with the Government, Henry hoped to have vastly reduced.  (See id.; see also Suppl. Support Memo at 1.)

In opposition, the Government asked the Court to reject this ground for habeas relief asserting "Henry's affidavit is unsupported by any credible evidence, is motivated by a desire to obtain monetary damages in connection with a civil lawsuit, and is flatly contradicted by his sworn and unsworn statements and the sworn declarations of law enforcement officers and his own attorney."  (Opp'n at 37; see also id. at 45 (asserting, in seeking to obtain money damages in his Section 1983 Action, Henry filed an affidavit, that included statements of which were meant "[t]o

29

overcome the obvious impediment with establishing that his arrest was unlawful" given Henry's prior admissions of involvement with the McClenic murder for which he was arrested).) Moreover, even if, _arguendo_, Henry's affidavit was true, given the other, overwhelming evidence of Petitioner's guilt, Petitioner cannot demonstrate it is probable he would be acquitted if afforded a new trial. (See _id._)

    2.   The Verified Complaint as Alleged "New Evidence"

Following Petitioner's arguments through their logical steps, the Court would have to agree with Petitioner that: (1) Henry's Verified Complaint, viewed as an affidavit, was a recantation; (2) said recantation was credible; (3) the recantation establishes Henry's trial testimony against Petitioner was perjured; and (4) Henry's alleged perjured trial testimony is enough to establish Petitioner did not have a fair trial. Upon the record before it, the Court declines to do so.

At the outset, "The Supreme Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Bowers v. Miller, No. 05-CV-6023L, 2009 WL 2045680, at *15 (W.D.N.Y. July 10, 2009) (citing Drake v. Portuondo, 553 F.3d 230, 241 (2d Cir. 2009) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976) (footnote omitted in original)).

30

Thus, "when the newly discovered evidence focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury." Id. (quoting United States v. White, 972 F.2d 16 (2d Cir. 1992) (citation omitted)) (internal quotation marks omitted). With that framework, the Court proceeds to analyze Petitioner's claim regarding Henry's Verified Complaint.

Both Petitioner and the Government characterize Henry's Verified Complaint as an affidavit. (See Petition at 7; Suppl. Support Memo at 4; Opp'n at 24.) There is precedent for doing so. For example, a verified complaint, sworn under penalty of perjury, may be treated as an affidavit in the context of deciding a summary judgment motion. See, e.g., Brandon v. Kinter, 938 F.3d 21, 26 n.5 (2d Cir. 2019) (explaining, where plaintiff's complaint "was sworn under penalty of perjury . . . , his allegations in the complaint c[ould] be considered as evidence for summary judgment purposes" (citing Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)); Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); Murray v. North, 774 F. Supp. 3d 621, n.1 (W.D.N.Y. 2025) (noting, "[b]ecause [p]laintiff's amended complaint [wa]s verified, the

Court may rely on it for factual details"); Zielinski v. Annucci, No. 17-CV-1087, 2020 WL 7074845, at *7 (N.D.N.Y. Nov. 12, 2020) ("A plaintiff's verified complaint is to be treated as an affidavit." (citing Colon)).  The Court finds no reason not to do likewise here; hence, Henry's Verified Complaint is construed as an affidavit.

### 3.   Is the Verified Complaint Evidence of Perjury?

Generally, a recantation is a formal withdrawal or rejection of one's previous statements or testimony made within the same case.  Recant, BLACK'S LAW DICTIONARY 1459 (10th ed. 2014). More bluntly, one who recants admits to lying.  See, e.g., Fernandez v. Capra, 916 F.3d 215, 228 (2d Cir. 2019).  The critical inquiry becomes, "When did the lying occur?  Then or now?"  See id.; see also, e.g., United States v. Bednard, 776 F.2d 236, 238– 39 (8th Cir.1985) (new trial motions based on recanted testimony are immediately suspect because "where a witness makes subsequent statements directly contradicting earlier testimony, the witness is either lying now, was lying then, or lied both times").  To answer that question, the Court must determine whether the recantation is credible.  See, e.g., United States v. Schlesinger, 438 F. Supp.2d 76, 101 (E.D.N.Y. 2006).  If it is determined the recantation is credible--i.e., the perjured testimony occurred "then", when the witness originally testified against the criminal defendant--the Court must also determine whether the witness's

perjured trial testimony would have changed the outcome of the defendant's trial.  See, e.g., Ortega v. Duncan, 333 F.3d 102, 108, 109 (2d Cir. 2003); see also Schlesinger, 438 F. Supp.2d at 101.

In conducting its analysis here, the Court begins by observing the Second Circuit has cautioned, "[i]n the analogous context of motions for a new trial, witness recantations are viewed 'with the utmost suspicion'." United States v. Carthen, 681 F.3d 94, 102 (2d Cir. 2012) (quoting Haouari v. United States, 510 F.3d 350, 353 (2d Cir. 2007)).  That same caution applies in the context of a habeas petition where a petitioner is similarly seeking to have a conviction or sentence vacated or set aside.  See 28 U.S.C. § 2255.  The Court proceeds accordingly, relying upon the guidance of cases determining motions for new trials based upon claims of witness perjury, which is sufficiently analogous to Petitioner's Ground Four "New Evidence" claim.

> In order to be granted a new trial on the ground that a witness committed perjury, the defendant must show that (i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at [the] time of trial; and (iv) the perjured testimony remained undisclosed during trial.

United States v. Cromitie, 727 F.3d 194, 221 (2d Cir. 2013) (alteration in original) (quoting United States v. Josephberg, 562 F.3d 478, 494 (2d Cir. 2009)); see also Fernandez, 916 F.3d at 224

(quoting Cromitie).  Further, "[t]he Second Circuit has frequently and repeatedly held that, even where newly discovered evidence indicates perjury, motions for new trials should be granted only with great caution and in the most extraordinary circumstances." Schlesinger, 438 F. Supp.2d at 101 (quoting United States v. Stewart, 433 F.3d 273, 296 (2d Cir. 2006); internal quotation marks omitted) (collecting cases); see also id. at 100 (stating further "Rule 33 authority should only be used 'sparingly'" (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)).  Indeed, "when the newly discovered evidence is a recantation of trial testimony, this stringent standard turns into skepticism." United States v. Lespier, No. 98-CR-0102, 2006 WL 533792, at *7 (D. Conn. Mar. 1, 2006) (citing DiPaolo, 835 F.3d at 49; further citations omitted); see also Dobbert v. Wainwright, 468 U.S. 1231, 1233-34 (1984) (instructing recantations must be looked upon with the utmost suspicion since they "upset society's interest in the finality of convictions, are very often unreliable and given for suspect motives, and most often serve merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction") (citation modified).

> When the proffered new evidence consists solely of a recantation, in order to succeed on a motion for a new trial the defendant must prove: (1) the testimony recanted was both false and material; (2) without the false testimony the jury probably would have acquitted the defendant; and (3) that the

> party seeking the new trial was taken by
> surprise when the false testimony was given
> and could not address that falsity until after
> the trial.  [United States v.] DiPaolo, 835
> F.2d [46,] 49 [(2d Cir. 1987)]; [United States
> v.] Stofsky, 527 F.2d [237,] 246 [(2d Cir.
> 1975)]; United States v. Lespier, No.
> [98-CR-0102], 2006 WL 533792, at *7 (D. Conn.
> Mar[.] 1, 2006).  The defendant bears the
> burden of satisfying each of the elements in
> the three-part test.  Id.; DiPaolo, 835 F.2d
> at 49 (citing United States v. Brown, 582 F.2d
> 197, 202 (2d Cir. 1978)).

Lespier, 2006 WL 533792, at *7 (emphasis added).  This is often

referred to as the "DiPaolo Test".[14]  Further, "[i]n cases where a

witness testifies at trial, then recants his trial testimony, and

ultimately, 'recants his recantation', the 'recanted recantation

can only be viewed with extreme skepticism.'" Id. at *5 (quoting

United States v. Gallego, 191 F.3d 156, 165 (2d Cir. 1999)).  At

bottom: "In deciding [a Criminal Rule 33] motion [based upon newly

discovered evidence,] the district court must examine the entire

case and may weigh the evidence and the credibility of witnesses,

but it must be careful not to 'wholly usurp' the role of the jury."

Schlesinger, 438 F. Supp.2d at 100 (quoting United States v.

Autuori, 212 F.3d 105, 120 (2d Cir. 2000)).

### 4.   The *Lespier* Case as Guidance

The Lespier case bears factual similarity to the instant

case and, like here, involved a repudiated recantation.   See

---

[14]  See United Sates v. Lespier, 266 F. App'x 5, *7 (2d Cir. Jan. 11, 2008).

generally Lespier, 2006 WL 533792.  Finding Lespier instructive to Petitioner's Ground Four "New Evidence" claim, the Court proceeds to examine it.

In 1998, Lespier and a co-defendant, Luis Adorno ("Adorno"), both members of the Latin Kings gang, were indicted by a federal grand jury for the murder of one Carlito Brown ("Brown") under the VICAR statute, 18 U.S.C. § 1959(a)(1).  See id. at *1. Brown's murder was the result of a turf war between rival gangs. See id.  Originally, Adorno was charged with Brown's murder "in the state court system, but the state charge was dismissed when the federal indictment was returned.  Just prior to trial, Adorno entered into a cooperation agreement with the Government and pleaded guilty to shooting . . . Brown.  Lespier proceeded to trial."  Id.

At trial, the Government presented the testimony of seven witnesses, including Adorno.  See id.  Adorno, a Latin King solider, testified that Lespier, the president of the Meriden, Connecticut chapter of the Latin Kings, had given him and others orders to kill a rival gang member.  See id.  Adorno further testified that after an unsuccessful first attempt, on the crew's second attempt, Adorno missed the intended target, killing Brown instead.  See id.  Other gang members testified against Lespier as well, including an inmate Lespier met while incarcerated.  See id. at *2-4.  Upon cross-examinations, Lespier's attorney questioned

these witnesses' motives for cooperating with, and testifying for, the Government; predominately, their motives were to secure more lenient sentences. See id. The jury found Lespier guilty; he was sentenced to life imprisonment, the VICAR mandatory minimum.[15] See id. at *1.

Approximately two years after testifying for the Government, Adorno reached out to Lespier's counsel; after meeting several times with Lespier's attorney, Adorno "signed an affidavit recanting his trial testimony." Id. at *4. "Adorno's affidavit stated that he did not kill Brown, and Lespier did not order him to do so." Id. at *4 n.5. Based upon Adorno's affidavit, Lespier moved for a new trial pursuant to Criminal Rule 33, which the Government opposed. See id. at *4.

The court held an evidentiary hearing on Lespier's new trial motion. See id. In support of his motion, Lespier called Adorno as a witness, who "repeatedly repudiated the affidavit which recanted his trial testimony. On both direct- and cross-examination, Adorno offered several reasons for lying and signing the false affidavit." Id. These reasons included: trying "to get the attention of his attorney or the government attorneys"; relatedly, as a means of seeking protection from other prisoners

---

[15] The Second Circuit affirmed Lespier's conviction. See United States v. Adorno, No. 99-1784, 2001 WL 253119 (2d Cir. Mar. 12, 2001).

who were hassling him; believing "recanting his trial testimony would convince other Latin King prisoner's that he was no longer a 'snitch'", thereby allowing him to be safely placed in general population; and, not being able to tell Lespier's attorney the real reason for contacting him, since "the attorney told Adorno he could do nothing for him and was not there to help him". Id. at *4-5; see also id. at *7-8 (discussing Adorno's motives for repudiating his recantation). "Adorno repeatedly testified that the affidavit was a lie." Id. at *6.

The court denied Lespier's new trial motion. See id. at *1; see also id. at *11. Following Second Circuit precedent, the court stated, "it [could] not focus solely on the credibility of the recantation and must give proper weight to other evidence," as well. Id. at *7 (citing Ortega, 333 F.3d 102). That "other evidence" included Adorno "specifically repudiate[ing] his recantation numerous times at the [evidentiary] hearing . . . and, more importantly, reaffirm[ing] his trial testimony." Id. And, "Lespier did not offer any additional evidence of Adorno's alleged perjury at the [evidentiary] hearing", but "relied solely on Adorno's repudiated affidavit" and Adorno's reasons for repudiating the affidavit. Id. Upon the record, the court found Lespier "ha[d] not offered any evidence that Adorno's trial testimony was false." Id. It stated: "This fact alone had led some courts to hold that repudiated recantations, without more,

38

are not newly discovered evidence and will not support a motion for new trial." Id. (collecting cases). Moreover, the court found Lespier's attempts "to prove Adorno's trial testimony was false by attacking his motives for repudiating the affidavit" to be unavailing. Id.; see also id. at *7-8. Additionally, Adorno's trial testimony was corroborated by several witnesses (see id. at *8-9 (reviewing the testimony of the seven trial witnesses)), and there was no evidence the jury would have acquitted Lespier without Adorno's testimony (see id. at *9-10 (providing examples of non-Adorno evidence which would have been sufficient to sustain verdict against Lespier)). At bottom, the court found letting the jury verdict stand was not a manifest injustice. See id. at *10-11 (reiterating a "court may not wholly usurp the jury's role and must give deference to the jury's resolution of the weight of the evidence and the credibility of witnesses").

### 5. Ground Four of the Instant Petition

The teachings of Lespier are instructive in this Court's consideration of Petitioner's "New Evidence" claim. The Court must consider the credibility of the recantation and give proper weight to other evidence of perjury before it. See Lespier, 2006 WL 533792, at *6-7.

#### a. No Hearing Required

Criminal Rule 33 does not require a district court to hold an evidentiary hearing before rendering a decision. Cf. FED.

39

R. CR. P. 33.   Rather, to do so is within a district court's discretion.   See, e.g., United States v. DiTomasso, 932 F.3d 58, 70 (2d Cir. 2016) ("We also review for abuse of discretion the court's decision as to the extent to which a hearing on a Rule 33 motion is needed." (citing generally United States v. Forbes, 790 F.3d 403, 406, 411 (2d Cir. 2015))).   Upon the record presented and for the reasons discussed infra, especially that the undersigned was the presiding judge over Petitioner's trial during which it observed Henry testify, took Henry's plea, and conducted several in-person proceedings regarding Henry's Early Termination Motion, which where attended by Henry and in which he participated, the Court finds no hearing is necessary on Petitioner's "New Evidence" claim, which is based solely upon Henry's Verified Complaint.   See, e.g., United States v. DiPaolo, 835 F.2d 46, 50-51 (2d Cir. 1987) (affirming denial of Rule 33 motion without a hearing where district court found evidence of witness's alleged recantation not credible and, therefore, defendant had "not satisfy[ied] the first requirement for granting a motion for a new trial-establishing the falsity of the trial testimony"); United States v. Choudhry, 813 F. App'x 4 (2d Cir. May 11, 2020) (affirming district court's denial of Rule 33 motion for new trial, which ruling below was made upon the papers and without a hearing, with district court finding proffered evidence was not newly discovered; reiterating "that in deciding a Rule 33 motion, the

test is whether it would be a manifest injustice to let the guilty verdict stand" (citation modified)); United States v. Donald, 417 F. App'x 41, 44-45 (2d Cir. Mar. 28, 2011) (affirming district court's denial of post-trial perjury claim without a hearing where: district court found affidavits from two witnesses to be incredible; district court observed the alleged perjurer's testimony at trial; and, the alleged perjurer submitted a supplemental affidavit denying the perjury allegations; citing DiPaolo); United States v. Roberts, 24 F. App'x 45, 47-48 (2d Cir. 2001) (affirming denial of Rule 33 motion without evidentiary hearing where district court found witness's trial testimony—rather than her post-trial affidavit recanting that testimony—was credible).

Having determined no hearing is required in this instance, the Court also finds it is not necessary to appoint Petitioner with "stand by counsel". (See Motion for Appointment of Counsel, ECF No. 752); cf. of Fed. R. Governing § 2255 Proceedings 8(c); accord Winslow v. Portuondo, 599 F. Supp.2d 337, 342-43 (E.D.N.Y. 2009) (in context of a Section 2254 habeas petition, stating identical Rule 8(c) "does not require appointment of counsel in habeas cases where no evidentiary inquiry is warranted"). Nor, for the reasons discussed supra and infra, do the interests of justice require the appointment of counsel. See 18 U.S.C. § 3006A(a)(2)(B); see also United States v. Phillips,

No. 05-CR-0012, 2007 WL 3143317, at *1 (D. Vt. Oct. 24, 2007) (stating "[a] prisoner has no constitutional right to the assistance of counsel" in bringing a Section 2255 habeas petition; denying appointment of counsel where it was questionable whether petitioner presented arguments "likely to be of substance"). Therefore, Petitioner's Motion for Appointment of Counsel is DENIED.

      b.   <u>Verified Complaint is Only Evidence Proffered</u>

      To begin, treating Henry's Verified Complaint as an affidavit, liberally construed, portions of it could be viewed as a recantation of Henry's trial testimony against Petitioner. (<u>See</u> Verified Complaint ¶¶ 24, 89-100 (hereafter, the "Recantation Statements").) However, in assessing its credibility, context matters. Henry made his Recantation Statements in a civil action, which--at least in part--was motivated by his own pecuniary interests; it was not apparently directed towards Petitioner's criminal action or, as in <u>Lespier</u>, related to Henry's involvement in that criminal action, <u>e.g.</u>, trying to secure his safety while imprisoned. <u>See, e.g.</u>, Henry's Section 1983 Action. Petitioner appears to concede that motivation. (<u>See, e.g.</u>, Reply at 3.) It is likely Henry, acting <u>pro se</u>, did not appreciate that his Recantation Statements could be viewed as such, especially when considering that his civil Section 1983 Action was assigned to another judge of this District. It is highly doubtful the Section

1983 Action was an attempt by Henry to attract the Government's attention. Cf. Lespier, 2006 WL 533792, at *4. This is borne out by the timing of the Government's sending a copy Henry's Verified Complaint to Petitioner three months after Henry commenced his Section 1983 Action, when the Government somehow became aware of it, as possible Brady material and in an abundance of caution. (See Gov't Jan. 18, 2022 Notification Letter, ECF No. 721.) Other than speculation, e.g., that other witnesses may have also given false testimony (see Suppl. Support Memo at 4 (baldly asserting testimony of Government witnesses Halyard, Mosley, Hernandez, and Walker "could very well be false as well"); see also Reply at 4), Petitioner fails to proffer any additional evidence demonstrating Henry perjured himself at Petitioner's trial. However, this Court "cannot focus solely on the credibility of the recantation and must give proper weight to other evidence." Lespier, 2006 WL 533792, at *6.

c.   Other Evidence

The Second Circuit has instructed that, notwithstanding "a recantations must be 'looked upon with the utmost suspicion,'" the lack of veracity of a recantation, in and of itself, cannot "establish whether testimony given at trial was in fact truthful." Ortega, 333 F.3d at 107. "Rather, the court must weigh all the evidence of perjury before it, including but not limited to the recantation, before reaching this conclusion." Id.

43

Here, there is other evidence buttressing the Court's conclusion that Henry's Recantation Statements are not credible and that Henry did not give perjured testimony at Petitioner's trial. The cumulative effect of said other evidence solidifies the Court's determination that letting Petitioner's conviction stand is not a manifest injustice.

### i.   Amended Verified Complaint

Henry's Recantation Statements cannot be considered in a vacuum. Significant to the Court's consideration of said Recantation Statements is Henry's subsequent attempt to amend his Verified Complaint. (See Section 1983 Action, Motion to Amend, ECF No. 36.) In his Proposed Amended Verified Complaint, Henry removed his Recantation Statements, which this Court deems a repudiation of his Recantation Statements. (See Section 1983 Action, Proposed Amended Verified Complaint, Ex. A, ECF No. 36 at ECF pp.8-33.) As the Lespier court instructed, a recantation that has itself been repudiated merely becomes impeachment evidence to be used on cross-examination and cannot be used as substantive evidence. Lespier, 2006 WL 533792, at *7. "This [scenario] alone has led some courts to hold that repudiated recantations, without more, are not newly discovered evidence and will not support a motion for new trial." Id. (collecting cases). That rationale is persuasive and weighs against Petitioner's "New Evidence" claim.

44

ii.   Declarations

Additionally, by way of several affidavits—i.e., one by Henry's former attorney's, Michael J. Biniakewitz (see Biniakewitz Decl., ECF No. 748-16, attached to Opp'n); one by FBI Special Agent Derrick Acker (see Acker Decl., ECF No. 748-15, attached to Opp'n); and, one by Nassau County Detective George Colby (see Colby Decl., ECF No. 748-17, attached to Opp'n)—the Government has presented persuasive evidence discounting portions of Henry's Recantation Statements and, by extension, supporting Henry's implicit repudiation of said Statements.  Among other things, each Declarant averred he was present during proffer sessions and/or trial preparation sessions between Henry and the Government (Biniakewitz Decl. ¶3; Acker Decl. ¶¶2-3; Colby Decl. ¶3); further, each Declarant stated, while attending the sessions: (1) Henry admitted his role in the McClenic murder and consistently identified Petitioner as the individual who shot and killed McClenic (Biniakewitz Decl. ¶4; Acker Decl. ¶5; Colby Decl. ¶4); (2) Henry never claimed to be innocent of or denied his role in the McClenic murder (Biniakewitz Decl. ¶5; Acker Decl. ¶5; Colby Decl. ¶6); and (3) Henry was never: (a) provided a narrative, coached or instructed as to what his testimony should be, or (b) coerced or threatened by the Government (Biniakewitz Decl. ¶5; Acker Decl. ¶5; Colby Decl. ¶6).  This evidence, especially that of Henry's then-criminal attorney, undermines Petitioner's contention Henry's

45

entire testimony was scripted by the Government "for the purpose of securing a conviction against [Petitioner] by any means necessary." (Suppl. Support Memo at 4.)  Petitioner's position to the contrary, which focuses solely upon the Recantation Statements and fails to acknowledge this "other evidence" which weighs against a finding of perjury (see, e.g., Reply at 3), does not establish Henry perjured himself when testifying against Petitioner.

### iii. Verified Early Termination Motion

Additionally, in his Early Termination Motion, signed under penalty of perjury, Henry asserted, inter alia, that this Court had sufficient opportunities to assess him and his demeanor. (See ECF No. 737, at ¶47.)  True; the undersigned has had ample opportunities to observe Henry's demeanor, as well as interact with him (e.g., observing Henry testify at Petitioner's trial; engaging in a colloquy with Henry during his plea allocution; and, presiding over Henry's sentencing hearing).  Indeed, the Court held several hearings on Henry's Early Termination Motion, in which Henry participated.  (See Minute Entry Nos. 759, 769, 777.)  From these interactions, the Court has had first-hand opportunities to assess Henry, observing his demeanor and evaluating his credibility.  It is well-established that "deference is owed to a judge who observed the witness's demeanor." Fernandez v. Capra, 916 F.3d 215, 228 (2d Cir. 2019) (citing In re Payne, 707 F.3d 195, 201 (2d Cir. 2013) (collecting cases)).  From its many

observations, the Court found Henry was, among other things, forthright and truthful.

Furthermore, Henry's statements in his Early Termination Motion were not inconsistent with his trial testimony against Petitioner, which is another reason to call into question the veracity of Henry's Recantation Statements. Indeed, said alignment between Henry's testimony and his Early Termination Motion averments underscore that Henry's monetarily motivated aberration of innocence of the state law "crimes of which he was arrested, tried and convicted" made in his civil Section 1983 Action is not worthy of credulity. (Verified Complaint, ¶24; see also id. at ¶97.) Hence, consideration of Henry's Early Termination Motion, filed under penalty of perjury, is "other evidence" which challenges the truthfulness of his Recantation Statements and not his testimony at Petitioner's trial.

### iv. Other Witnesses' Testimony

The Court has carefully reviewed the transcripts from Petitioner's criminal trial held before the undersigned and agrees with the Government's position that the evidence of Petitioner's "guilt was overwhelming and went well beyond Henry's testimony." (Opp'n at 46.) Indeed, as highlighted by the Government: "For the McClenic murder conviction, which is the only subject of Henry's purported recantation, four other witnesses (Halyard, Hernandez, Walker and Mosley), who were some of Smith's closest

friends, separately testified that Smith admitted to each of them that he shot and killed McClenic." (Id.; see also id. at 13 (re: Halyard's testimony (citing Trial Tr. 686-87, 690, 741-42, 943-44)); id. at 14 (re: Hernandez's testimony (citing Trial Tr. 1310, 1497-98), and re: Mosley's testimony (citing Trial Tr. 1737, 1782-85, 1792-94, 1866)); id. at 15 (re: Walker's testimony (citing Trial Tr. 2608, 2610-11, 2616-21)).)  Significantly, Petitioner concedes the testimonies of these witnesses were confirmatory of each other.  (See Suppl. Support Memo at 4; Reply at 3, 4.) Further, the testimony of non-cooperating, civilian witness Rampersad also substantiated aspects of cooperating witness Halyard's testimony, i.e., that Petitioner told him about knocking on McClenic's car window before shooting McClenic.  (See id.)  All this evidence lends additional credence to finding the Recantation Statements were not credible and Henry's trial testimony was truthful and not perjured.

### v.   Further Other Evidence

Moreover, there is further other evidence discrediting Petitioner's claim of perjured trial testimony by Henry.  For example, as mentioned supra, the Court has considered the allocution it accepted from Henry when he plead guilty in this case and in accordance with a cooperation agreement with the Government.  (See Plea Hr'g Tr., Ex. 3500-BH-19, ECF No. 748-14.) At Henry's plea hearing, the following colloque occurred:

48

```
THE COURT:      Other than the proffer agreement
                of December 22, 2016, have any
                promise, agreements or conditions
                been given to you other than
                those [i]n your cooperation
                agreement?
DEFENDANT:      No.
THE COURT:      Is anyone forcing you to plead
                guilty here or to cooperate?
DEFENDANT:      No.
THE COURT:      Are you doing so because you are
                guilty and for no other reason?
DEFENDANT:      Yes.
```

(Id. at 14:14-24.) Henry also confirmed his understanding of the cooperation agreement and that his cooperation with the Government had to be truthful. (See id. at 18:14-16, 10:12-18.) He then proceeded to describe his actions which made him guilty of the crime to which he pled guilty; in pertinent part, Henry admitted the following:

```
DEFENDANT:      On December 15, 2010, I drove
                two members of the Crips to a gas
                station located in Hempstead, New
                York.
                One of the Crips, Eric Smith,
                was armed with a handgun. I knew
                that Eric Smith was getting out
                of the car to shoot someone.
                When we arrived near the gas
                station, Smith got out of the
                car, walked to the gas station,
                and shot and killed a rival gang
                member named James McClenic.
                Smith then ran back to my car
                and then drove away.
                I did this because that's what
                was expected of me because of my
                membership and position in the
                Crips.
```

(Id. at 15:22-16:8.)   The Court found Henry's plea to be knowing and voluntary.   (See id. at 18:11-13.)   And, it confirmed with Henry that no one had threatened or forced him to plead guilty. (See id. 18-15-16.)   It is well-established that "[a] criminal defendant's self-inculpatory 'solemn declarations in open court carry a strong presumption of verity.'"   Hayes v. New York, No. 10-CR-5867, 2012 WL 6675121, at *16 (E.D.N.Y. Dec. 21, 2012) (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)).   "Such statements 'are generally treated as conclusive in the face of the defendant's later attempt to contradict them.'"   Id. (quoting Adames v. United States, 171 F.3d 728, 732 (2d Cir. 1999)).   Thus, this Court's having taken Henry's guilty plea and having interacted with him in doing so, during which exchange the undersigned found Henry to be truthful, lends weight to its finding Henry's Recantation Statements are incredible.

The Court also considers Henry's Vacatur Agreement as "other evidence" in determining whether his trial testimony was perjured.   (See Vacatur Agreement, Ex. 2, ECF No. 748-2.)   As explicitly stated in said Agreement, the Nassau County District Attorney's Office was consenting to the vacatur of Henry's state court conviction regarding the murder of McClenic, which was to be replaced by his federal plea and sentence, based upon Henry's cooperation with the Government and his trial testimony against Petitioner.   (Id. at 1.)   In his Vacatur Agreement, Henry stated:

50

"I was the driver who transported [Petitioner] to and from the murder scene" and Petitioner "shot and killed James McClenic, Jr. on 12/15/10 in Nassau County, N.Y." (Id. at 1.)  Of import, Henry signed the Vacatur Agreement "after full consultation with [his] attorney" and entered into it "knowingly, intelligently, and voluntarily", having "not been coerced, threatened or made any other promises" to do so, other than as listed and agreed to in the Vacatur Agreement (see id. (listing agreed terms, which were each initialed by Henry) and agreed to in Henry's Plea Agreement with the Government.  (Vacatur Agreement at 2 (witnessed by Henry's Defense Counsel).)  The Vacatur Agreement was executed October 25, 2018, after Henry had testified in 2017 against Petitioner.  The Court is hard-pressed to believe the District Attorney's Office would agree to vacate Henry's conviction if it was not firmly convinced of the veracity of his representations, including that he participated in McClenic's murder which Petitioner performed. This belief contributes to the Court's finding that the Recantation Statements—as opposed to Henry's trial testimony—are not true.

–*–*–*–

At bottom, the Court agrees with the Government that Henry's Recantation Statements "def[y] logic and common sense" since his trial testimony "was detailed and corroborated."  (Opp'n at 43-44 (providing copious examples of the detailed testimony Henry provided (citing Trial Tr. 2297, 2421-41, 2247-49)).)  As

51

the Government aptly argues:  "It is simply absurd to believe Henry would have been able to provide such detailed testimony, which was consistent with his prior statements and corroborated by other evidence, unless he actually lived those events and was recounting them for the jury."  (Id. at 44.)  The Court concurs, especially since Henry's testimony was corroborated in various aspects by: (1) the trial testimony of other witnesses, e.g., Halyard, Hernandez, Mosley, Walker, Rampersad, and the crime scene detective; (2) crime scene photographs; and (3) ballistics evidence recovered at the murder scene.  (See id. at 44-45.) Rather, this vast array of corroborating evidence undergirds the Court's determination that Henry's trial testimony was truthful, and his Recantation Statements were not.  Indeed, Henry's Recantation Statements are "implausible and in stark contrast to [his] detailed and consistent testimony given under oath, [and] as observed by the [undersigned] trial judge" and, therefore, should be "looked upon with the utmost suspicion."  United States v. DeFeo, No. 90-CR-0250, 1997 WL 3259, at *8 (S.D.N.Y. Jan. 6, 1977) (stating, further, "[t]he Second Circuit has affirmed district courts' decisions to deny a motion for a new trial where the district court observed the trial testimony of the witness and found that the subsequent recantation lacked credibility" (emphasis added) (collecting cases)), aff'd, 152 F.3d 921 (2d Cir. 1998); see also, e.g., United States v. Mangano, No. 16-CR-0540,

52

2022 WL 65775, at *63 (E.D.N.Y. Jan. 6, 2022) (stating, in analyzing defendant's Rule 33 motion for new trial, the court considered, inter alia, its "familiarity with all the evidence and witnesses in this matter that the Court observed and scrutinized over the course of two lengthy trials where [the alleged perjured witness] took the stand"), aff'd in part, rev'd in part and remanded, 128 F.4th 442 (2d Cir. 2025) (agreeing with district court that overwhelming evidence showed witness did not commit perjury in his trial testimony, which was strongly corroborated by other trial evidence); Lespier, 266 F. App'x at 7 (affirming denial of Rule 33 motion for new trial where witness recanted his trial testimony, but repudiated that recantation at subsequent hearing; upholding district court's finding defendant had failed to meet his burden of proving witness's trial testimony was false).  In the end, upon the record presented, Petitioner has failed to prove Henry's trial testimony was false.[16]  See Lespier, 266 F. App'x at

---

[16] Moreover, even assuming, arguendo, that Henry's trial testimony was perjured, because of the overwhelming other evidence of Petitioner's guilt of the McClenic murder (see, e.g., supra at 47-48 (identifying the testimony of other witnesses regarding Petitioner having murdered McClenic); see also Opp'n at 46 (outlining non-Henry testimony and other evidence supporting the jury's guilty verdict as to McClenic's murder)), the lack of Henry's testimony would not have affected the jury's guilty verdict.  Given the absence of a probability that the jury would have acquitted Petitioner without Henry's testimony, Petitioner's Ground Four "New Evidence" claim remains unavailing.  See Lespier, 2006 WL 533792, at *9 ("Even if the Court were to find that the defendant had proven [the alleged perjurer's] trial testimony was false, the defendant has failed to satisfy the second element

8 ("emphasiz[ing] that a district court should give little evidentiary weight to a recantation affidavit that has since been repudiated").  As such, Petitioner's Ground Four "New Evidence" claim does not warrant granting him habeas relief.

–*–*–*–

To the extent not explicitly addressed herein, the Court has considered Petitioner's remaining arguments and finds them to be without merit.  In sum, none of the Grounds advanced by Petitioner in his Petition demonstrate he is being imprisoned in violation of the law; therefore, there is no basis to grant him habeas relief.

CONCLUSION

Accordingly, for the reasons set forth above, **IT IS HEREBY ORDERED** that Petitioner's Petition (ECF No. 727) is **DENIED** in its entirety; relatedly, Petitioner's Motion to Appoint Counsel (ECF No. 752) is also **DENIED** in its entirety;

**IT IS FURTHER ORDERED** that, because there can be no debate among reasonable jurists that Petitioner was not entitled to habeas relief, the Court does not issue a Certificate of Appealability, see 28 U.S.C. § 2253(c); see also Middleton v. Att'ys Gen., 396 F.3d 207, 209 (2d Cir. 2005); and, (2) certifies

---

necessary for granting a new trial—that the jury probably would have acquitted Lespier in the absence of false testimony." (citations omitted)).

that any appeal of this Order would not be taken in good faith, and thus his in forma pauperis status is denied for the purposes of any appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962); and

   **IT IS FURTHER ORDERED** that the Clerk of the Court: (1) mark CLOSED the corresponding civil cases, Case No. 22-CV-1187 and Case No. 22-CV-1188; and (2) mail a copy of this Memorandum and Order to the pro se litigant at his address of record, including the notation "LEGAL MAIL" on the mailing envelope.

         **SO ORDERED.**

      /s/ JOANNA SEYBERT
      Joanna Seybert, U.S.D.J.

Dated:   January 9, 2026
   Central Islip, New York